

## Fourth Court of Appeals
### San Antonio, Texas

**MEMORANDUM OPINION**

No. 04-22-00313-CV

In the Interest of **G.K.T.**, a Child

From the 285th Judicial District Court, Bexar County, Texas
Trial Court No. 2021PA00800
Honorable Kimberly Burley, Judge Presiding

Opinion by:      Liza A. Rodriguez, Justice

Sitting:         Rebeca C. Martinez, Chief Justice
                 Patricia O. Alvarez, Justice
                 Liza A. Rodriguez, Justice

Delivered and Filed: November 2, 2022

AFFIRMED

Appellants E.T. ("Mother") and J.C.T. ("Father") appeal from a judgment terminating their parental rights to G.K.T. ("the child").[1] Both parents contend the evidence is legally and factually insufficient to support the trial court's best interest finding. We affirm.

### BACKGROUND

On May 7, 2021, the child, who was only nine months old at the time, was removed from Mother's care because of concerns about her continued drug use and unaddressed mental health issues. On the same day, the Department filed a petition for termination of Mother's and Father's parental rights. The Department prepared service plans for Mother and Father, requiring them to

---

[1]To protect the identity of the minor child, we refer to the parties and the child by fictitious names, initials, or aliases. *See* TEX. FAM. CODE. § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

complete substance abuse and psychosocial assessments and to participate in individual counseling, domestic violence classes, and parenting classes. Additionally, both service plans called for Mother and Father to demonstrate their sobriety by passing random drug tests.

On May 6, 2022, the case proceeded to a bench trial. At the time of trial, the child was twenty-one months old. The Department presented the testimony of three witnesses—the Department's family-based services caseworker, the Department's legal caseworker, and a CASA[2] volunteer. Mother did not present any witnesses. Father testified on his own behalf. After hearing the evidence, the trial court signed a judgment terminating Mother's and Father's parental rights based on two predicate grounds: (1) constructive abandonment of the child, and (2) failure to complete their court-ordered family service plans. *See* TEX. FAM. CODE § 161.001(b)(1)(N),(O). The trial court also found that termination of parental rights was in the child's best interest. *Id*. § 161.001(b)(2).

Both Mother and Father appeal the trial court's termination judgment. Neither parent challenges the predicate grounds for termination. However, both parents challenge the sufficiency of the evidence to support the trial court's best interest finding.

### STANDARD OF REVIEW

To terminate parental rights under section 161.001 of the Texas Family Code, the Department has the burden to prove by clear and convincing evidence that parental rights should be terminated pursuant to one of the predicate grounds in subsection 161.001(b)(1) and that termination of parental rights is in the child's best interest. *See* TEX. FAM. CODE § 161.001(b)(1),(2). In reviewing the legal sufficiency of the evidence to support these findings, we look "at all the evidence in the light most favorable to the finding to determine whether a

---

[2]Child Advocates San Antonio.

reasonable [factfinder] could have formed a firm belief or conviction that the finding was true." *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). In reviewing the factual sufficiency of the evidence, we consider disputed or conflicting evidence. *Id.* at 345. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266). Under these standards, the factfinder is the sole judge of the weight and credibility of the evidence. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

### THE CHILD'S BEST INTEREST

Under Texas law, there is a strong presumption that the best interest of the child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). In determining whether the child's parent is willing and able to provide the child with a safe environment, we consider the factors listed in section 263.307(b) of the Texas Family Code.[3] TEX. FAM. CODE § 263.307(b). In addition to these statutory factors, we consider the non-exhaustive list of factors set forth by the Texas Supreme Court in *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).[4]

---

[3]These factors are: (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills; and (13) whether an adequate social support system consisting of extended family and friends is available to the child. TEX. FAM. CODE ANN. § 263.307(b).

[4]These factors are: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist the individuals seeking custody to promote the child's best interest; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or the proposed

"The absence of evidence about some of these considerations would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). Evidence that proves one or more statutory ground for termination may also prove that termination is in the child's best interest. *Id*. at 28. "A best interest analysis may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence." *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied).

### MOTHER'S APPEAL

In her sole issue, Mother argues the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights was in the child's best interest.

At trial, Blanca Rosales, a family-based caseworker, testified that the Department started working with the family because of Mother's marijuana use and her unaddressed mental health issues. Mother told Rosales she had been diagnosed with bipolar disorder, anxiety, and ADHD. A doctor had prescribed medication for her, and Mother needed help with taking her medication. Rosales tried to get Mother the assistance she needed to address her mental health issues. On one occasion, Rosales even arranged transportation for Mother to attend an appointment at a mental health facility.

Rosales testified that, during the family-based services phase of the case, Mother tested positive for methamphetamines. Mother admitted that she struggled with cocaine, marijuana, and heroin use, but nevertheless insisted that she was able to use illegal drugs and care for the child. Mother did not acknowledge the threat her drug use posed to the child. During one home visit,

---

placement; (8) the parent's acts or omissions indicating that the existing parent-child relationship is not a proper one; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).

Rosales noticed that Mother appeared to be under the influence—Mother was argumentative, fidgety, and unable to walk properly. Rosales sent Mother for a drug test and the results showed that Mother was using the same drugs that she had admitted to using in the past. Rosales tried to work with Mother to develop a safety plan for the child, such as finding someone to supervise Mother with the child. However, these efforts were unsuccessful. Additionally, when Rosales arranged for the child to participate in early childhood intervention ("ECI") services, Mother failed to ensure that the child participated in these services.

Kisha Mitchell-Dinkins, a legal caseworker for the Department, testified that Mother failed to participate in individual counseling, but she did complete parenting classes, domestic violence classes, and an inpatient substance abuse program. Unfortunately, Mother soon relapsed. Mother, who was then pregnant with another child, admitted to Mitchell-Dinkins that she was continuing to use cocaine. Mitchell-Dinkins twice referred Mother for another substance abuse assessment, but she refused to participate. "Illicit drug use is relevant to multiple *Holley* factors, including the child[]'s emotional and physical needs now and in the future, the emotional and physical danger to the child[] now and in the future, Mother's parental abilities, the stability of Mother's home, and the acts or omissions which may indicate an improper parent-child relationship." *In re A.N.*, No. 04-19-00584-CV, 2020 WL 354773, at *3 (Tex. App.—San Antonio Jan. 22, 2020, no pet.).

Mitchell-Dinkins testified that she also sent Mother for drug testing. On all but one occasion, Mother failed to show up for drug testing. Mother's failures to show up for drug testing when requested by the Department are treated as positive results. *See In re E.R.W.*, 528 S.W.3d 251, 265 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ("[A] fact finder can reasonably infer that a parent's failure to submit to court-ordered drug tests indicates the parent is avoiding testing because they were using illegal drugs."). The one time Mother showed up to take a drug test, the results showed that Mother was using some of the same illegal drugs that she had used in the past.

Mitchell-Dinkins further testified that initially Mother attended her visits with the child. However, in the four months preceding trial, Mother missed eight of her visits with the child. Based on her observations of Mother's visits, she noticed an improvement in the way Mother held the child and talked to him. Mitchell-Dinkins attributed this improvement to Mother's participation in parenting classes. Mitchell-Dinkins acknowledged that there was a bond between Mother and the child. Nevertheless, Mitchell-Dinkins expressed concern that Mother did not have the stability to provide for the child, noting that during the pendency of this case Mother was unemployed and had lived in five different places.

The evidence showed that the child had been placed in a foster home immediately upon removal and was living in the same foster home at the time of trial. "When a child is too young to express his desires, the factfinder may consider whether the child has bonded with the foster family, is well-cared for by them, and has spent minimal time with a parent." *In re F.M.A.*, No. 04-16-00318-CV, 2016 WL 4379456, at *3 (Tex. App.—San Antonio 2016, pet. denied). "The stability of the proposed home environment is an important consideration in determining whether termination of parental rights is in the child's best interest." *In re J.D.*, 436 S.W.3d 105, 120 (Tex. App.—Houston [14th Dist.] 2014, no pet.). "Stability and permanence are paramount in the upbringing of children." *Id*. "[T]he prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." TEX. FAM. CODE § 263.307(a).

A CASA volunteer testified that he performed an unexpected visit to the foster home where the child was living. During the visit, the CASA volunteer observed the foster father interacting with the child and teaching him how to play with a toy. According to the CASA volunteer, the foster home was well-kept, and the foster mother worked at caring for the child.

Mitchell-Dinkins testified the child's foster home was safe and stable. She observed the interaction between the foster mother and the child. Mitchell-Dinkins saw the way the child looked

at and responded to the foster mother. She also saw the way the foster mother responded to the child. Mitchell-Dinkins described the child as adventurous, talkative, and very smart. The child's younger sister was living in the same foster home. Both children had a bond with the foster parents, who were very attentive to the children and cared for their needs. According to Mitchell-Dinkins, the foster home was "directed toward the children" and the foster mother "ha[d] dedicated herself to the children." Mitchell-Dinkins explained that if the court were to terminate Mother's and Father's parental rights, the foster parents wanted to adopt both children. She thought the foster parents would be an appropriate long-term placement for the child.

In reviewing all the evidence in the light most favorable to the trial court's finding, we conclude a reasonable factfinder could have formed a firm belief or conviction that termination of Mother's parental rights was in the child's best interest. There was ample evidence from which the trial court could have concluded that Mother did not address her sobriety during the pendency of the case, that she was unwilling to complete counseling services, that she lacked stable housing and employment, and that she was inconsistent in visiting the child. Based on the evidence, the trial court could have reasonably concluded that Mother was incapable of meeting the child's emotional and physical needs now and in the future, that the child's foster parents were meeting his current emotional and physical needs, and that the Department would ensure that the child's future emotional and physical needs were met. We conclude the evidence is legally sufficient to support the trial court's finding that termination of Mother's parental rights was in the child's best interest.

With regard to factual sufficiency, we recognize there was some evidence that relapses may be part of the recovery process and that Mother completed some of the services in her service plan. However, given all the other evidence presented, we conclude the evidence is factually

sufficient to support the trial court's finding that termination of Mother's parental rights was in the child's best interest.

We overrule Mother's issue.

**FATHER'S APPEAL**

In his sole issue, Father argues the evidence is legally and factually insufficient to support the trial court's finding that termination of his parental rights was in the child's best interest.

Rosales testified that the Department's involvement in the case began in Laredo, Texas. During the family-based phase of the case, Father was asked to complete random drug tests. One time when Father was asked to drug test, he failed to show. Instead, the family left Laredo and moved to San Antonio. Father admitted to Rosales that the family left Laredo because he knew that if he took a drug test, the results would be positive for illegal drugs. After the family moved to San Antonio, the Department contacted Father and directed him to take another drug test. Father appeared for this drug test and the results were positive. Father did not dispute the results and he admitted to using illegal drugs. At the time, Father acknowledged that he needed help with a drug assessment and treatment, yet he missed multiple drug assessment appointments. Father finally completed a drug assessment, and he was referred to the Best Option drug treatment program.

Mitchell-Dinkins testified that Father failed to complete the Best Option drug treatment program. Father was discharged from the program twice for failing to participate. However, Father did participate in some Department-mandated drug testing. Mitchell-Dinkins said Father's drug test results from August 2021, January 2022, and April 2022 were "concerning." When asked about the first two drug test results, Father acknowledged that he was struggling with marijuana. Father told Mitchell-Dinkins that he was having mental health issues. According to Mitchell-Dinkins, the April 2022 drug test result was positive for drugs "beyond marijuana." As to this drug

test, Father said the results could not be true because he was drug testing for pretrial services and those results were negative.

Mitchell-Dinkins testified that Father had been arrested multiple times for offenses involving drugs. At the beginning of the family-based case, Father was on parole in Laredo. Then, in November 2021, eight months after the Department filed its termination petition, Father was arrested for manufacturing of a controlled substance, a first-degree felony. Father told Mitchell-Dinkins he was on probation for this offense, but he did not provide her with any supporting documentation. According to Mitchell-Dinkins, Father's pattern of criminal activity and incarceration interfered with his ability to care for the child. "A history of drug abuse and an inability to maintain a lifestyle free from arrests and incarcerations is relevant to a trial court's best-interest determination." *In re F.M.A.*, 2016 WL 4379456, at *3.

Mitchell-Dinkins testified that Mother and Father were in a relationship for much of this case. She had seen Mother and Father "cussing in the lobby, at the Department." However, by the time the case went to trial, Mother and Father were no longer in a relationship. Early in the case, Father admitted that he and Mother had arguments that included physical contact such as throwing objects. Later in the case, Father said that he and Mother still had arguments but he insisted that they were only verbal in nature.

Mitchell-Dinkins further testified that Father failed to complete the domestic violence course as required by his service plan. The first time that Father enrolled in a domestic violence course, he was discharged for failing to attend classes. The month before trial, Father enrolled in another domestic violence course, which consisted of eighteen classes. By time of trial, Father had only attended one of the classes.[5] Additionally, during much of the case, Father failed to

---

[5]There was evidence that Father attended other domestic violence classes, but they were not the correct program for him.

participate in individual counseling as required by his service plan. Father was discharged by three separate counselors for failing to show up or for failing to schedule appointments. At the time of trial, Father was seeing a new counselor, but he had not attended very many sessions. The first time Father enrolled in parenting classes, he was discharged for failing to participate. Father had recently re-enrolled in parenting classes, but he had not completed the course. Mitchell-Dinkins recognized that Father had some mental health issues in January and February 2022, which may have affected his ability to engage in services for a brief time. However, she pointed out that the Department's suit was filed in May 2021. Father could have engaged in services for the first half of the case, but he failed to do so.

Mitchell-Dinkins testified that Father's record of visiting the child was inconsistent. Father participated in thirty-seven visits and missed thirteen visits. Father told Mitchell-Dinkins that the reason he missed some visits was because he was in a psychiatric facility. Father also represented to Mitchell-Dinkins that he was late to some visits because of his job. During the visits, the child and Father watched movies and played with toys, and Father encouraged the child to eat. Mitchell-Dinkins acknowledged that the Father had a bond with the child.

According to Mitchell-Dinkins, Father told her that he worked in construction and lived with his father. On the morning of trial, Father provided Mitchell-Dinkins with paystubs. Nevertheless, Mitchell-Dinkins characterized Father's life as unstable because of his recent incarcerations and continued drug use. Based on the facts and circumstances of the case, Mitchell-Dinkins believed that Father's relationship with the child was not a proper one. Finally, as previously detailed, the child was living in a foster home with foster parents who were very attentive and caring for his needs.

Father testified on his own behalf. He attributed his delay in engaging in services to his incarceration, stating that his "mentality was more about being in prison." However, Father said

he now realized that his children were the most important part of his life. Father confirmed he had past arrests for controlled substances and harassment of a public servant, and a recent arrest for manufacturing and delivery of a controlled substance.

Father contended that he was discharged from the Best Options drug treatment program because of scheduling conflicts with his job. Father said that he had an upcoming drug assessment and he planned to keep this appointment. As to his other service plan requirements, Father testified he needed only two more classes to finish the parenting course, and he recently participated in two individual counseling sessions.

Father disputed the accuracy of his recent Department drug test, which was positive for cocaine and marijuana. Father noted that his recent drug tests for pretrial services were clean, but admitted that the Department drug test was different from the pretrial services drug test. The Department drug test included a hair follicle test, which can detect drug use over a longer time period. The pretrial services drug test was only a urinalysis and did not include a hair follicle test.

Finally, Father testified that he had four other children from another relationship, but he was not raising them. Father's four other children lived with his mother. Father said he was not raising his other children because he was saving money to buy a house.

In reviewing all the evidence in the light most favorable to the trial court's finding, we conclude a reasonable factfinder could have formed a firm belief or conviction that termination of Father's parental rights was in the child's best interest. There was ample evidence from which the trial court could have concluded that Father did not address his sobriety, that he was inconsistent in visiting the child, that he was unwilling to complete counseling services, and that he was unwilling to effectuate positive personal changes in his life within a reasonable time period. Based on the evidence, the trial court could have reasonably concluded that Father was incapable of meeting the child's emotional and physical needs now and in the future, that the child's foster

parents were meeting the child's current emotional and physical needs, and that the Department would ensure that the child's future emotional and physical needs were met. We conclude the evidence is legally sufficient to support the trial court's finding that termination of Father's parental rights was in the child's best interest.

With regard to factual sufficiency, Father disputed the accuracy of his recent drug test results. In addition, there was some evidence that Father's work schedule and his mental health issues affected his participation in services and his visitation with the child. However, given the other evidence presented, we conclude the evidence is factually sufficient to support the trial court's finding that termination of Father's parental rights was in the child's best interest.

We overrule Father's issue.

## CONCLUSION

The trial court's judgment is affirmed.

Liza A. Rodriguez, Justice